# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

IDA S.,[1]

  *Plaintiff*

  v.

COMMISSIONER OF SOCIAL SECURITY,

  *Defendant*.

No. 3:21cv578 (MPS)

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

  Plaintiff Ida S. brings this administrative appeal against the Commissioner of Social Security under 42 U.S.C. § 405(g) challenging the Commissioner's denial of her application for supplemental security income.  On appeal, the Plaintiff argues that the Administrative Law Judge ("ALJ") (1) failed to properly analyze the opinion of a consultative examiner regarding her mental impairments and mischaracterized the results of the IQ test the examiner administered; (2) failed to properly evaluate Listing 12.02 (neurocognitive disorders), and (3) failed to develop the record as to her physical impairments.  ECF No. 21.  For the reasons that follow, I find that the ALJ did not err and that the decision is supported by substantial evidence.  Accordingly, I grant the Commissioner's motion to affirm the decision (ECF No. 26) and deny the Plaintiff's motion to reverse and remand. (ECF No. 21).

  I assume familiarity with the Plaintiff's medical history, as summarized in the Plaintiff's statement of facts, ECF No. 21-1, which the Commissioner incorporates and supplements, ECF No. 26-2, and which I adopt and incorporate by reference. I also assume familiarity with the five

---

[1] As set forth in Chief Judge Underhill's January 8, 2021 Standing Order, the Plaintiff is identified by her first name and last initial. See Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

sequential steps used in the analysis of disability claims, the ALJ's opinion, and the record.[2]  I cite only those portions of the record and the legal standards necessary to explain this ruling.

## I.   Standard of Review

The Court "may vacate the agency's disability determination only if it is based on legal error or unsupported by 'substantial evidence' - that is, if no reasonable factfinder could have reached the same conclusion as the ALJ."  *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022).

> The substantial evidence standard is a very deferential standard of review - even more so than the clearly erroneous standard…. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion….In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn….If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld….The substantial evidence standard means once an ALJ finds facts, [the Court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*.

*Id.* at 74 (internal quotation marks; citations omitted; emphasis in original).

## II.   ALJ's Decision

The ALJ found that the Plaintiff, who was 41 years old as of her alleged onset date, suffered from severe impairments of status-post craniotomy with vertigo and headaches, borderline intellectual functioning, depressive disorder, anxiety disorder, panic disorder, post-traumatic stress disorder, neurocognitive disorder, and spondylosis of the cervical spine.  R. 27-28, 39.  He also found that the Plaintiff suffered from non-severe impairments of obesity, varicose veins, irritable bowel syndrome, gastritis, hemorrhoids, sinus disease, mitral valve prolapse, and levocurvature of the spine.  R. 28.  The ALJ determined that the Plaintiff's impairments did not, singly or in combination, meet or medically equal the severity of any of the listed impairments in 20 C.F.R.

---

[2] Citations to the administrative record, ECF No. 18, appear as "R" followed by the page number appearing on the bottom right hand corner of the record.

Pt. 404, Subpt. P, App. 1. R. 29. The ALJ found that the Plaintiff retained the residual functional

capacity ("RFC")[3] to perform sedentary[4] work with the following limitations: she must use a cane

for walking, only occasionally climb ramps and stairs, cannot climb ladders, ropes or scaffolds,

occasionally balance, stoop, kneel, crouch, and crawl, must avoid concentrated exposure to

vibration, cannot work at unprotected heights, cannot operate machinery having moving,

mechanical parts which are exposed, cannot operate a motor vehicle, can work in environments

having a moderate noise level, can perform simple, routine tasks but not at a strict production rate

pace, can execute simple, routine instructions, can tolerate occasional interaction with the general

public, can tolerate occasional minor changes in her work setting and work procedures, and can

set simple, routine work plans.  R. 33.  Finally, based on the testimony of a vocational expert, the

ALJ determined that there were jobs that the Plaintiff could perform, and therefore concluded that

she was not disabled at any time between her alleged onset date of August 3, 2018 and June 23,

2020, the date of the decision. R. 41.

**III.    Discussion**

**A.    Dr. Pleshkevich's report**

The Plaintiff first argues that the ALJ's RFC finding is not supported by substantial

evidence because the ALJ "failed to properly analyze" the psychological evaluation conducted by

consultant Andrew Pleshkevich, Ph.D.  ECF No. 21-2 at 3.

An ALJ assesses a claimant's RFC "based on all of the relevant medical and other

evidence." 20 C.F.R. § 416.945(a)(3). "In deciding a disability claim, an ALJ is tasked with

---

[3] The RFC is an assessment of the most a claimant can still do despite her limitations. 20 C.F.R. § 416.945(a)(1).
[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 416.967.

'weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole.'" *Benman v. Comm'r of Soc. Sec.*, 350 F. Supp. 3d 252, 256-57 (W.D.N.Y. 2018) (alterations in original) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013)).  For claims filed after March 27, 2017, such as this one, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion[s]." 20 C.F.R. § 416.920c(a). Instead, "the ALJ will consider a series of factors, including, *inter alia*, supportability, consistency, relationship to the claimant, and specialization when evaluating a medical opinion." *Colgan v. Kijakazi*, 22 F.4th 353, 359 n.2 (2d Cir. 2022); *see* 20 C.F.R. § 416.920c(c).  Supportability and consistency are "the most important factors" an ALJ considers when determining how persuasive he finds a medical source's medical opinions, and the ALJ must explain how he considered these factors.  20 C.F.R.  § 416.920c(b)(2).  "The ALJ may - but is not required to - explain how he considered the remaining factors….However, when the opinions offered by two or more medical sources about the same issue are both equally well-supported ... and consistent with the record ... but are not exactly the same, the ALJ will articulate how he considered the remaining factors in evaluating the opinions." *Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 8 (W.D.N.Y. 2021) (quotation marks and citations omitted). *See* 20 C.F.R. § 416.920c(b)(3).

The Plaintiff asserts that the ALJ erred in his analysis of Dr. Pleshkevich's findings as to the Plaintiff's IQ.  ECF No. 21-2 at 3.

Dr. Pleshkevich performed a psychological evaluation on October 27, 2018, during which he administered various tests including the Wechsler Adult Intelligence Scale, fourth edition (WAIS-IV), an IQ test.  R. 449-55.  On the WAIS-IV, the Plaintiff obtained a full-scale IQ of 59, which falls in the extremely low classification of overall cognitive abilities.  R. 451.  According to

the Dr. Pleshkevich, "[b]ased on her results, the probability that the range of scores from 56 to 63 includes her true IQ is 90 out of 100." *Id.* Dr. Pleshkevich set forth Plaintiff's results in each of the four indexes that comprise the overall score. On the Verbal Comprehension index, the Plaintiff obtained a score of 74, which falls in the borderline classification of abilities. *Id.* On Perceptual Reasoning, she scored 63, which falls in the extremely low classification of abilities. *Id.* On Working Memory, she scored 58, which also falls in the extremely low classification of abilities. *Id.* As to Processing Speed, Plaintiff scored 62, which also is in the extremely low classification of abilities. *Id.* Dr. Pleshkevich concluded that the Plaintiff "would likely demonstrate severe impairment in the ability to understand and carry out instructions due to likely premorbid cognitive functioning on a Borderline level along with severe impairment in visuaospatial functioning, working memory and processing speed likely attributed to brain surgery." R. 455.

The ALJ noted Dr. Pleshkevich's report, acknowledged that the Plaintiff suffered from impaired cognitive ability, *see* R. 37 (noting that the record suggests "significant mental restriction"), and found that she suffered from severe impairments of borderline intellectual functioning and neurocognitive disorder, diagnoses made by Dr. Pleshkevich. The ALJ concluded, however, that Plaintiff's "cognitive testing was not entirely indicative of her true cognitive abilities." R. 38. *See also* R. 37 (finding that record evidence did not "fully support the level of cognitive restriction" indicated by the testing). The Plaintiff argues that this finding was error. I disagree.

The ALJ found that the record contained other evidence as to the Plaintiff's cognitive abilities that was not consistent with, and did not support, the degree of severity indicated by the Plaintiff's IQ test results. The ALJ pointed out that the Plaintiff's performance on other testing administered by Dr. Pleshkevich indicated "minimal impairment." R. 35, 451. He also noted that

Dr. Pleshkevich found that the Plaintiff's results on personality testing suggested that her test results should be interpreted cautiously as "[she] engaged in exaggerated responses, confusion, and carelessness in answering questions." R. 35. *See* R. 452 (Dr. Pleshvehich's report stated that the Plaintiff "may not have answered in a completely forthright manner" which could lead to an "inaccurate impression" of her and that the Plaintiff "endorse[d] items that present an unfavorable impression or represent extremely bizarre and unlikely symptoms[,]" which "suggests that the profile may exaggerate complaints and problems.") As a result, Dr. Pleshkevich urged that the "interpretive hypotheses presented in th[e] report should be reviewed with caution." R. 452. The ALJ heeded this advice.

In addition, other opinion evidence in the record did not support the severity indicated by the IQ score. A 2017 evaluation by consultant Dr. Kogan found that the Plaintiff has "[n]ormal expressive and receptive language," was able to "recall the date of birth and social security number," could "register[] 3/3 objects and recall[] 3/3 objects at 3 minutes," and could "provide[] a 6 digit forward memory span." R. 827; R. 36. A 2018 consultative examination by Dr. Dodenhoff indicated that the Plaintiff could "understand, remember and carry out instructions." R. 820; R. 36. In her February 2019 assessment, State Agency Consultant Dr. Susan Uber opined that while the Plaintiff has severe limitations, she was capable of engaging in simple routine, repetitive tasks. R. 159; R. 38. Records from the Plaintiff's medical providers (as opposed to consultants) also did not indicate severe cognitive deficits. R. 35. Although outside the relevant period, notes from her neurologist, Dr. Adamo, from 2009 and 2010, after her craniotomy, did not indicate impaired cognitive function. *See* R. 377 (10/30/09 note stating "On mental status, the patient shows normal language and cognitive function.") R. 370 (5/18/10 note stating "on mental status, the patient is somber and slow but otherwise shows normal language and cognitive

function."); R. 369 (6/3/10 note stating same); R. 368 (7/26/10 note stating "the patient shows normal language and cognitive function"); R. 367 (8/30/10 note stating same). Nor did more recent records within the relevant timeframe from her primary care physician, Dr. Guardino, who followed her closely. *See* R. 575-77 (notes dated 11/19/18); R. 572-74 (1/15/19); R. 569-71 (3/7/19); R. 566-68 (4/1/19); R. 563-65 (5/9/19); R. 560-62 (6/18/19); R. 557-59 (7/9/19); R. 553-56 (9/10/19); R. 549-52(11/5/19); R. 543-48 (12/19/19). The Plaintiff's gastroenterologist, Dr. Skopic, also did not indicate impaired cognitive function. *See* R. 498-99 (notes dated 2/12/19); R. 506 (4/2/19); R. 513 (5/7/19); R. 520 (8/20/19). The ALJ appropriately analyzed the supportability and consistency of Dr. Pleshkevich's opinion as to the Plaintiff's IQ, and his assessment of Dr. Pleshkevich's opinion was supported by substantial evidence.

The Plaintiff next argues that the ALJ "erred in his findings regarding Dr. Pleshkevich's opinion as to the plaintiff's other mental impairments." ECF No. 21-2 at 5. Specifically, the Plaintiff asserts that "the ALJ's statement that Dr. Pleshkevich's opinion found the Plaintiff to be exaggerating her symptoms was error." *Id.*

In assessing the Plaintiff's test results on the Personality Assessment Inventory, Dr. Pleshkevich stated in pertinent part:

> There may have been some idiosyncratic responses to particular items that would affect test results. Thus, the interpretive hypotheses that follow in this report should be reviewed cautiously.
> The degree to which response styles may have affected or distorted the report of symptomatology on the inventory is also assessed. Certain of these indicators fall outside of the normal range, suggesting that [Plaintiff] may not have answered in a completely forthright manner; the nature of her responses might lead the evaluator to form a somewhat inaccurate impression of [Plaintiff] based upon the style of responding described below.…
> With respect to negative impression management, there are indications that [Plaintiff] tended to endorse items that present an unfavorable impression or represent extremely bizarre and unlikely symptoms. This result suggests that the profile may exaggerate complaints and problems. It is likely that these unusual endorsements were the result of confusion or careless responding.…Elevations in

this range could also be indicative of a "cry for help", or an extremely negative evaluation of oneself and one's life. Although this pattern does not necessarily indicate a level of distortion that would render the test results invalid, the interpretive hypotheses presented in this report should be reviewed with caution because the clinical scale elevations are likely to overrepresent the extent and degree of significant test findings in certain areas….

Given certain response tendencies previously noted, it is possible that the clinical scales may overrepresent or exaggerate the actual degree of psychopathology.

R. 452.   Dr. Pleshkevich noted that the Plaintiff reported both a "level of depressive symptomatology" and "degree of somatic concern" that were "unusual even in clinical samples." R. 453.  Under "Clinical Impressions," Dr. Pleshkevich stated that "the personality test was valid but the pattern of responses on the validity scales was suggestive of some exaggeration."  R. 454.

In his decision, the ALJ stated that

[t]he consultative examiner also noted that the claimant reported "extremely bizarre and unlikely symptoms" and that test results should be interpreted cautiously as the claimant engaged in exaggerated responses, confusion, and carelessness in answering questions (Exhibit 5F). This suggests that these results may not accurately reflect the claimant's true functioning, which was suggested upon reconsideration review by the State agency consultants (*See* Exhibit 3A).

R. 30.

The ALJ did not misstate the evidence.  Rather, the ALJ's characterization was a fair assessment of Dr. Pleshkevich's report in which he noted more than once that the Plaintiff's responses suggested exaggeration.

The Plaintiff also contends that the ALJ's "notation that the opined limitations [found by Dr. Pleshkevich] are inconsistent with evidence of record" is unsupported.  ECF No. 21-2 at 5.

According to Dr. Pleshkevich, the Plaintiff reported "the following symptoms suggestive of a diagnosis of moderate depression:  chronic depressed mood; negative thoughts focused on how bad her life has been since her health has deteriorated; hopelessness; low motivation, and self-isolation involving spending most her of her time alone. She described her depression as constant

rather than episodic."  R. 454.  Dr. Pleshkevich further stated that the Plaintiff's "pattern of responses" on testing was "similar to that of people who have been diagnosed with PTSD."  *Id.* He opined that her "ability to interact appropriately with coworkers, supervisors and the public would appear to be moderately impaired due to her depression and anxiety."  R. 455.  Diagnoses indicated by the test results and the interview were "Major depressive discover, single episode, moderate; PTSD, chronic; Panic Disorder without agoraphobia; Borderline Intellectual Functioning; and Mild Neurocognitive Disorder due to medical condition."  *Id.*

In his decision, the ALJ took note of Dr. Pleshkevich's report and acknowledged that Plaintiff reported sad feelings, depression and anxiety; that medical records indicated that she appeared very anxious at times when meeting with providers; and that she appeared depressed and subdued at a consultative examination.  R. 35.  But the ALJ also observed that the Plaintiff had not received any treatment for psychological issues, R. 35, 114, and testified at the hearing that she had no trouble interacting with others although she did not leave the home often.  R. 30, 115-16. Further, treatment records from the Plaintiff's physicians reflected generally benign mental status findings. R. 35.  See R. 461 (11/19/18 note indicating mild depression), R. 543 (12/19/19 note indicating same); R. 573 (1/15/19 note indicating intact insight and judgment, normal affect and speech); R. 657, 632, 628 (2/12/19, 4/2/19, 5/7/19 records stating "negative for dysphoric mood. The patient is not nervous/anxious."); R. 570, 567 (3/7/19, 4/1/19 records indicating plaintiff has normal mood); R. 564, 562, 559 (5/9/19, 6/18/19, 7/9/19 records stating plaintiff presented as oriented with intact insight and judgment, normal affect and speech); R. 555 (9/10/19 record indicating plaintiff has normal mood).  Contrary to the Plaintiff's argument, the ALJ's assessment as to the severity of the Plaintiff's mental impairments is supported by substantial evidence.

**B.      Step Three:  Listing 12.02**

The Plaintiff next argues that the ALJ failed to properly analyze Listing 12.02.  ECF No.

21-2 at 10.

Listing 12.02 applies to neurocognitive disorders, which are disorders "characterized by a

clinically significant decline in cognitive functioning."   20 C.F.R. Pt. 404, Subpt. P, App.

1, Listing 12.02.  To satisfy this listing, a claimant's impairments must meet paragraph A criteria

and either paragraph B or paragraph C criteria. *See id*.  Listing 12.02 provides:

> A.      Medical documentation of a significant cognitive decline from a prior level
> of functioning in one or more of the cognitive areas:
> 1.  Complex attention;
> 2.  Executive function;
> 3.  Learning and memory;
> 4.  Language;
> 5.  Perceptual-motor; or
> 6.  Social cognition.
>
> AND
>
> B.      Extreme limitation of one, or marked limitation of two, of the following
> areas of mental functioning (see 12.00F):
> 1.      Understand, remember, or apply information (see 12.00E1).
> 2.      Interact with others (see 12.00E2).
> 3.      Concentrate, persist, or maintain pace (see 12.00E3).
> 4.      Adapt or manage oneself (see 12.00E4).
>
> OR
>
> C.      Your mental disorder in this listing category is "serious and persistent;" that
> is, you have a medically documented history of the existence of the disorder over a
> period of at least 2 years, and there is evidence of both:
> 1.      Medical treatment, mental health therapy, psychosocial support(s), or a
> highly structured setting(s) that is ongoing and that diminishes the symptoms and
> signs of your mental disorder (see 12.00G2b); and
> 2.      Marginal adjustment, that is, you have minimal capacity to adapt to changes
> in your environment or to demands that are not already part of your daily life (see
> 12.00G2c).

The Plaintiff argues that she meets paragraph A because Dr. Pleshkevich stated that her

language reasoning score on the IQ test of 74, which was higher than her overall score, was likely

an indication of her functioning before her brain surgery.  ECF No. 21-2 at 11.  She further argues that her learning and memory scores, which were in the subaverage range, show "a significant deficit."  *Id.*  She reasons that taken together, the difference in her scores indicates that she suffered a cognitive decline as required by paragraph A.  But, she maintains, the ALJ "failed to discuss the listing in any manner" and "while he did address the paragraph B criteria which is similar in Listings 12.02 and 12.05 . . . he did not address the criteria for paragraph C of Listing 12.02."  ECF No. 21-2 at 12.

In his decision, the ALJ stated that he considered whether the Plaintiff's mental impairments met or medically equaled the criteria of listings 12.02, 12.04, 12.05, 12.06, and 12.15. R. 29.  As to these, he considered whether the Plaintiff met paragraph B criteria.[5]  *Id.*  In assessing paragraph B criteria, the ALJ must evaluate a claimant's limitation in ability in four areas of mental functioning:  (1) understand, remember, or apply information;  (2) interact with others; (3) concentrate, persist, or maintain pace;  and (4) adapt or manage oneself.  20 C.F.R. § 404.1520a(c)(3).  R. 30-31.  The rating is based on a five-point scale of "none, mild, moderate, marked, and extreme." 20 C.F.R. § 404.1520a(c)(4). To meet Listing 12.02, a claimant must have an extreme limitation of one, or marked limitation in two of the above-mentioned four areas of mental functioning.  A "marked limitation" means the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 12.00F2. An "extreme limitation" means the claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." *Id.*  The ALJ determined that the Plaintiff had only moderate limitations in the four areas of mental functioning.  R. 29-31.  He concluded that because the Plaintiff's "mental impairments did not

---

[5] Listings 12.02, 12.04, 12.06, and 12.15 have the same Paragraph B criteria.

cause at least two 'marked' limitations or one 'extreme' limitation, the paragraph B criteria are not satisfied." R. 31. The ALJ then considered whether the Plaintiff met paragraph C criteria. *Id.* As to this, the ALJ found that the "evidence fails to establish the presence of the paragraph C' criteria." *Id.* In support, the ALJ noted that that Plaintiff had not sought "significant treatment for her alleged mental impairments during the relevant period, indicating that she did not require a highly structured living environment to manage her conditions." *Id.*

Contrary to the Plaintiff's argument, the ALJ did consider whether the Plaintiff met listing 12.02. Although the ALJ did not address whether the Plaintiff's mental impairments met paragraph A criteria, he determined that she did not meet either paragraph B or C criteria, as she must in order to meet the listing. The Plaintiff does not specifically contest the ALJ's paragraph B findings, see ECF No. 21-2 at 12, and to the extent that she relies on her argument that the ALJ failed to make proper findings as to her mental impairments based on Dr. Pleshkevich's report, I have addressed those arguments. As to the Plaintiff's assertion that the ALJ failed to make findings as to paragraph C, the text of the ALJ's decision clearly shows that that is not the case. R. 31.[6]

## C.      Duty to Develop the Record

In her final argument, the Plaintiff asserts that the ALJ erred by failing to develop the record as to the Plaintiff's physical impairments. ECF No. 21-2 at 13. Specifically, she contends that the ALJ was under a duty to develop the record to seek a medical source statement because "there was no clear opinion of record regarding Plaintiff's physical impairments." *Id.* at 14. According to the Plaintiff, the ALJ "should have requested an opinion of [Plaintiff's] physical limitations from treating sources at Nassau Suffolk Neurology, including treating neurologist Dr. Adamo" or alternatively, should have recontacted consultative examiner Robert Dodenhoff, M.D. for a

---

[6] The Plaintiff does not address how she meets the criteria.

clarified opinion of [Plaintiff's] physical limitations" because his opinion was vague.  *Id.* at 15.

"The ALJ has an affirmative obligation to develop a complete and accurate medical record." *Mahmud v. Saul*, No. 3:19CV1666(TOF), 2020 WL 6866674, at *10 (D. Conn. Nov. 23, 2020).  *See* 42 U.S.C. § 423 ("[T]he Commissioner of Social Security ... shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability.").  "Failure to develop the record is reversible legal error." *Torres v. Saul*, No. 3:19CV1160(TOF), 2020 WL 6144658, at *7 (D. Conn. Oct. 20, 2020).  But the ALJ's "duty to develop the administrative record is triggered only if the evidence before [the ALJ] is inadequate to determine whether the plaintiff is disabled." *Ronald B. v. Comm'r of the Soc. Sec. Admin*., No. 3:21CV381(SALM), 2022 WL 1210741, at *4 (D. Conn. Apr. 25, 2022) (internal quotation marks and citation omitted).  "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citation and quotation marks omitted).

In addition to the ample evidence of Plaintiff's medical records and test results, the ALJ had before him the opinions of examining consultants Drs. Kogan and Dodenhoff and of non-examining State agency physician, Dr. Breton.

Dr. Kogan noted that the Plaintiff reported generalized musculoskeletal pain involving the posterior torso and all four extremities and numbness affecting her entire body. R. 825.  She reported daily chronic headaches.  *Id.*  She also reported a diagnosis of mitral valve prolapse in 1999 and that she suffers from chest pains.  *Id.*  She did not take any medication. R. 826. On examination, she "provide[d] no active movement of the cervical spine, lumbar spine or any of the

joints of the upper and lower extremities bilaterally due to generalized reported musculoskeletal pain." R. 827.  But Dr. Kogan observed that

> [o]utside the formal exam setting, [the Plaintiff] rotate[d] the cervical spine briskly and unguardedly to 60 degrees right and left while looking about the room.  She reach[ed] above and below shoulder level with both upper extremities without guarding when manipulating her personal items.  She also use[d] both hands briskly and with normal dexterity to manipulate her personal items.  She achieve[d] full and unguarded bilateral hip flexion and external rotation and bilateral knee flexion when removing her shoes and socks in the seated position.  She [was] able to mount the exam table, recline fully on the exam table and dismount the exam table exhibiting range of motion at the lumbar spine significantly beyond that provided on formal exam.

*Id.*  Dr. Kogan found "no evidence for sustained dysfunction due to head pain." R. 828.  He stated that the Plaintiff's "[r]ange of motion and motor examinations are diffusely limited by effort and discrepancy between the level of function on formal exam and the much better level of function observed outside the formal exam ….This makes work-related limitations difficult to predict."  R. 827-28.

The ALJ found Dr. Kogan's opinion persuasive in part because the record evidence suggested some work-related restrictions and his failure to provide a description of the Plaintiff's physical abilities reduced the value of his opinion.  R. 36.

In his opinion, Dr. Dodenhoff noted that the Plaintiff complained of low back pain, vertigo and headaches, mitral valve prolapse, and no feeling in her hands.  R. 819.  His report indicated that she is able to perform activities of daily living without assistance, does not cook or clean, and uses an electric cart when she goes shopping.  *Id.*  It also stated that the only medication she took was Motrin.  R. 819.  Dr. Dodenhoff determined that the Plaintiff was able to sit, stand, and walk using a cane, lift and handle objects, had intact hearing and speaking, and was able to understand, remember, and carry out instructions.  R. 820.

The ALJ found Dr. Dodenhoff's opinion persuasive in part.  R. 36.  The ALJ found that Dr. Dodenhoff's opinion was "consistent with and supported by the evidence of record as a whole, which showed that the claimant complained of neck and left arm pain, vertigo, and trouble ambulating following her 2009 brain surgery and showed findings of 4/5 weakness of the legs and left arm, an antalgic or slowed gait with cane use, and tenderness of the back at times … but also showed that the claimant often presented with intact strength of the extremities, in no distress."  R. 37.  The ALJ found that "[t]his evidence supports the opinions referring to sitting, standing, walking, and need for a cane provided by Dr. Dodenhoff."  *Id.*  The ALJ did not, however, find Dr. Dodenhoff's opinions as to the Plaintiff's mental abilities consistent with other record evidence, which indicated "some significant mental restrictions."  *Id.*

In February 2019, State agency physician Dr. Breton determined, after a review of the record, that the Plaintiff retained the ability to frequently lift and/carry objects weighing up to 10 pounds, occasionally lift and/or carry 20 pounds, stand and/or walk 2 hours, and sit 6 hours.  R. 161-62.  Dr. Breton further found that Plaintiff had postural limitations in that she could only occasionally climb ramps, stairs, balance, stoop, crouch, crawl, and kneel, and could never climb ladders/ropes/scaffolds.  R. 162.  The ALJ found Dr. Breton's opinion was largely consistent with the record evidence.  R. 38.

Here, there were no "clear gaps" in the administrative record necessitating further development of the record as to the Plaintiff's physical impairments.  *Rosa*, 168 F.3d at 79.  The ALJ had before him a complete record consisting of medical opinions, treatment notes, and test results as well as the Plaintiff's own testimony, which was adequate to permit an informed finding by the ALJ.  *See Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (Where "the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual

functional capacity …, a medical source statement or formal medical opinion is not necessarily required.") (internal quotation marks and citations omitted).

The Plaintiff seems to suggest that the ALJ was under a duty to develop the record because the medical opinions did not correspond precisely to the RFC he determined.  But "there is no requirement that the ALJ pick one RFC [opinion] and use that particular evaluation in its entirety." *Alexandrea R.R. v. Berryhill*, No. 15-CV-756(FPG), 2019 WL 2269854, at *6 (N.D.N.Y. May 28, 2019). Rather, "it is the ALJ's responsibility to choose between properly submitted medical opinions and other competent evidence to piece together an overall [RFC] assessment." *Id.*  Here, the ALJ resolved conflicts between the various medical opinions and credited those portions of the medical opinions he deemed most consistent with and supported by Plaintiff's overall treatment records and activities and made an RFC finding consistent with the overall record.[7]  *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.")

---

[7] Moreover, the ALJ assessed greater limitations than those opined by Drs. Dodenhoff, Kogan, and Breton.  "And it is well established that '[w]here an ALJ makes an RFC assessment that is more restrictive than the medical opinions of record, it is generally not a basis for remand.'" *Jennifer Lynn E. v. Kijakazi*, No. 3:20CV695(TOF), 2021 WL 4472702, at *13 (D. Conn. Sept. 30, 2021) (citing cases).

**IV.     Conclusion**

For these reasons, the Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF

No. 21) is DENIED and the Commissioner's Motion to Affirm the Decision (ECF No. 26) is

GRANTED.  The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
       June 6, 2022